UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CR-20167-KMW

UNITED STATES OF AMERICA,

 Plaintiff,

v.

JULIO SANDI ALVAREZ,

 Defendant.
_____/

**<u>DEFENDANT JULIO SANDI ALVAREZ'S SENTENCING MEMORANDUM</u>**

  Mr. Julio Sandi Alvarez, by and through undersigned counsel, hereby files this Sentencing Memorandum to aid the Court in fashioning a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in Title 18 United States Code § 3555(a). Mr. Alvarez respectfully requests that this Court consider the following factors in determining an appropriate sentence.

**Mr. Alvarez's History and Characteristics**

  Mr. Alvarez was born on May 11, 1990, in the city of Punta Arenas, a port city on the Pacific Coast of Costa Rica. For the first few years of his life, Mr. Alvarez was raised by both of his parents. Then, when he was five years old, his father left the family. His father abandoning the family left Mr. Alvarez and his mother in poverty. His mother, without much formal education or any vocational training, struggled to provide for herself and her son. Prior to Mr. Alvarez's father leaving, his mother had

1

been a homemaker. After he left, she found the only work she could, on the line at a tuna packing plant. The pay for this grueling work was not enough to make ends meet.

The severity of the family's poverty left a lasting impact on Mr. Alvarez. He recalls that his mother struggled each month to pay for the basics, including utilities. The electricity was frequently cut off at their home when the bills went unpaid. His mother was unable to buy him the clothing and shoes he needed as he grew. And Mr. Alvarez recalls going to bed hungry on many nights.

Because of the family's poverty, Mr. Alvarez was also not able to complete school. He attended primary school and began secondary school but had to leave after the sixth grade because his mother could not afford to continue sending him. Though Costa Rica has free public schools, the related costs of the required uniforms, books, and supplies, were unattainable for his family. Mr. Alvarez began working shortly after leaving school to help support himself and his mother. He helped support her financially until her death from breast cancer in 2010, when Mr. Alvarez was 20 years old.

Though he has not had the benefit of higher education, Mr. Alvarez has worked hard since young adulthood. For most of his adult life, he has worked on and in the water. He has held various maritime jobs, including commercial fishing, sport fishing, and guiding scuba diving expeditions for tourists. All of these jobs have been physically punishing. And the pay for all his work has been both low and highly

variable, depending on such uncontrollable factors as whether the fish were biting, the weather, and the vagaries of the tourism industry.

While these jobs have been enough for Mr. Alvarez to provide the basics for himself, he was not earning enough to support his family they way he wanted to. After Mr. Alvarez's mother died, his grandparents took him in. His grandmother is now 75 years old and suffers from various health issues, including cardiovascular problems. Her health, together with her age, keep her from being able to work. Mr. Alvarez's grandfather, also in his late 70s, is deaf and cannot speak. Because of his disabilities, he too, cannot work. Mr. Alvarez's grandparents' home is all they have. It is in terrible condition, however, and in need of extensive repairs to keep it habitable as his grandparents age.

Mr. Alvarez's basic pay working on tourist boats did not provide him the funds to make the needed repairs to his grandparents' home. Though he always worked hard, his limited education impeded his ability to make enough to support both himself and his family. It was under these circumstances that he was susceptible to the recruiter who approached him about making the journey that led to his arrest. While it does not excuse the choice he made, Mr. Alvarez would never have undertaken this risky venture were it not for his poverty and his desire to care for the family he has left.

**The Nature of the Offense**

Mr. Alvarez was drawn in to participate in this offense only because of his financial straits. And while he stood to gain more than he could otherwise earn in

years of working on tourist boats in Costa Rica, it would not be "easy money." The risks he faced on the journey on the open seas were tremendous and underscore Mr. Alvarez's desperation.

While the recitation of the offense conduct contained in the presentence report is accurate (*see* PSI ¶¶ 7-12), it does not fully convey the harsh realities of the journey Mr. Alvarez took. Mr. Alvarez initially traveled from Costa Rica to Colombia to meet the boat he would later be arrested on. This initial journey took several days. He and his co-defendant then had to wait several days more in a small cabin in a lawless area of the Colombian jungle. These days were filled with uncertainty and fear, as Mr. Alvarez had no idea what to expect. They simply awaited orders from the unknown individuals in charge of the operation.

When Mr. Alvarez and Mr. Cortes Cantillo were eventually brought out of the jungle and back to the coast, they laid eyes on the boat they were charged with returning to Costa Rica. While the boat in this case was described as a "go-fast vessel"—as the boats involved in such cases typically are—that term implies a level of sophistication that does not match reality.



The vessel, pictured above, was a simple "panga" style boat with two outboard motors. There was no below-deck area to offer shelter. Likewise, the deck itself was completely uncovered and open to the elements. And the deck of this small boat was loaded with huge barrels of fuel and the bales of drugs these two men were tasked with transporting. There was scarcely enough space for them to sit or lie down on this days-long journey, much less a place for them to take shelter from the punishing sun and waves of the open ocean. On top of all that, one of the outboard engines malfunctioned during the journey, leaving the boat dependent on a single engine. That Mr. Alvarez attempted to make this incredibly dangerous journey of hundreds of miles indicates just how bad he believed his situation to be.

**Deterrence and Promoting Respect for the Law**

While Mr. Alvarez accepted these risks to try to help his family, he now fully understands that it was not worth it. All he wanted was to provide for his family, and

as a result of his choices, he will be unable to do so for the duration of his sentence. It bears noting that Mr. Alvarez has no criminal history. Until he accepted the risk to take on this journey, he has led a life of hard work and respect for the law. Accordingly, any sentence of years that Mr. Alvarez receives will sufficiently deter him from future criminal activity. A sentence within the guideline range is far greater than necessary in this case to achieve that purpose.

### Consideration for the Additional Health Risks and Harsh Conditions Mr. Alvarez Now Faces

Finally, Mr. Alvarez asks the Court to consider the conditions he now faces while incarcerated in determining an appropriate sentence. As a result of the global coronavirus pandemic, the Bureau of Prisons has modified its operations to help control the spread of the novel virus. These modifications include increased lockdowns with very limited opportunities for those incarcerated to spend time outside their cells. This means that their time to exercise, have access to phones and email to keep in touch with family, and even to shower, is strictly limited. While these modifications are absolutely necessary to help control the spread of the virus, they also mean that the conditions of confinement are significantly harsher than they would be in more normal times.

Additionally, while the Bureau of Prisons has modified its operations, the changes it has made have not been sufficient to curtail widespread infections within its facilities. To date, over 19,657 federal inmates have been confirmed to have

COVID-19, and 135 inmates have died from the disease.[1] This represents an infection rate of approximately 15.6% of the total inmate population.[2] Compare that figure with the infection rate in the general population of the United States, which, while high, currently stands at approximately 3%.[3]

The disproportionately high rate of infection within the Bureau of Prisons demonstrates the difficulty of containing a highly contagious disease like the novel coronavirus in the confines of a jail or prison, where social distancing and other preventative measures are not possible. Public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[4] Indeed, the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[5] Prior to March 13, 2020, when the BOP suspended visits, inmates regularly engaged

---

[1] *See https://www.bop.gov/coronavirus/*. This figure includes those with current active cases, those who tested positive and have been deemed "recovered," and those inmates who have died from the disease.

[2] *See id*. The BOP reports a total inmate population, as of November 12, 2020, of 125,293.

[3] As of November 12, 2020, the CDC reports a total of 10,170,846 confirmed COVID-19 cases in the United States. *https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days*. As of the same date, the United States Census Bureau reports a total U.S. population of approximately 330,578,000. *https://www.census.gov/popclock/*.

[4] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at *https://bit.ly/2W9V6oS*.

[5] Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8): 1047-1055 (2007), available at *https://doi.org/10.1086/521910*; Vice, "Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits" (Mar. 24, 2020), available at *https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits*.

in social, legal and medical visits with people in the community at a time when the novel coronavirus already began to spread. To this day, inmates must share communal living spaces, such as cells, recreation rooms, dining halls, libraries, and exercise yards. To make matters worse, hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission, is deemed forbidden "contraband" in BOP facilities because of its alcohol content.[6]

To date, Mr. Alvarez has avoided infection. This has been a stroke of luck, especially considering the fact that his cellmate tested positive for the disease. While he has been lucky to date, it is likely a matter of when, not if, he becomes infected, as a result of the conditions within the jail and the terrifying infection rates.

**Conclusion**

Mr. Alvarez submits to the Court that his personal background, including his lack of any criminal history, his history of employment, and the health risks he faces while incarcerated, merit consideration for a variance from the advisory sentencing guideline range. Although his background in no way excuses the crime for which he has pleaded guilty, he asks this Honorable Court to consider his personal characteristics and the way he has conducted himself since his arrest in fashioning an appropriate sentence.

---

[6] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Corona- virus When Purell is Contraband?," *ABA Journal* (Mar. 13, 2020), available at *https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-pris- ons-contain-coronavirus.*

WHEREFORE, Mr. Alvarez respectfully requests this Court take into consideration the foregoing circumstances in determining an appropriate sentence in this matter.

                                              Respectfully submitted,

                                              MICHAEL CARUSO
                                              FEDERAL PUBLIC DEFENDER

                       By:    /s/Abigail E. Becker
                            Assistant Federal Public Defender
                            Florida Bar No. 72284
                            150 W. Flagler Street, Suite 1700
                            Miami, Florida  33130
                            Tel:   305-530-7000
                            abigail_becker@fd.org


## CERTIFICATE OF SERVICE

I HEREBY certify that on November 12, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                                ***/s/Abigail Becker***